United States Court of Appeals,

Fifth Circuit.

No. 93-8320

Summary Calendar.

In the Matter of FAIRCHILD AIRCRAFT CORPORATION, Debtor.

BUTLER AVIATION INTERNATIONAL, INC., Appellant-Cross-Appellee,

v.

Bettina M. WHYTE, Fiscal Agent, Appellee-Cross-Appellant.

Nov. 17, 1993.

Appeal from the United States District Court for the Western District of Texas.

Before SMITH, WIENER, and EMILIO M. GARZA, Circuit Judges.

WIENER, Circuit Judge:

This case involves the attempted recovery of funds paid over time by the debtor, Fairchild Aircraft Corporation ("Fairchild"), to Defendant-Appellant Butler Aviation International ("Butler") for fuel that Butler had provided to a customer of Fairchild, Air Kentucky Airlines ("Air Kentucky"). Plaintiff-Appellant Bettina M. Whyte was appointed Fiscal Agent to pursue avoidance actions on behalf of the unsecured creditors of Fairchild. In that capacity, she instituted this avoidance proceeding, arguing that Fairchild did not receive "reasonably equivalent value" under 11 *U.S.C.* § 548 for any of the fuel payments. The bankruptcy court concluded that Fairchild received reasonably equivalent value for those payments made while Air Kentucky was in service and flying, but not for those made after Air Kentucky ceased operations. Accordingly, the bankruptcy court entered judgment ordering repayment of that latter category of payments only. Butler appealed to the district court, which affirmed. Here, Butler continues its appeal from the bankruptcy court's judgment ordering it to pay over the post-operation payments; Whyte cross-appeals, seeking return of all fuel payments made by Fairchild to Butler, both before and after Air Kentucky ceased operations. Finding no reversible error, we affirm.

I

FACTS AND PROCEEDINGS

This case arises out of Fairchild's ill-fated buyer-seller relationship with Air Kentucky. During the relevant period, Fairchild was engaged primarily in the manufacture and sale of commuter aircraft. Air Kentucky was a commuter airline operating in Kentucky and Indiana as part of the USAir system pursuant to a code-sharing agreement. Under such an agreement, the commuter airline, flying under the colors of the major airline, delivers passengers from smaller communities to airports in larger cities where the major airline maintain centers of operations, called "hubs."

In early 1988 Fairchild viewed Air Kentucky as a prime potential customer because of its code-sharing agreement with USAir. According to the Chairman of Fairchild, Fred Kopko, Fairchild believed that it could sell Air Kentucky as many as twenty aircraft over a three-year period at an average profit of $800,000 each. Fairchild also thought that its relationship with Air Kentucky could lead to a long-term, exclusive relationship with USAir.

Fairchild's plans for Air Kentucky could not be realized, however, unless Air Kentucky were financially sound. Unfortunately for all concerned, Air Kentucky was not in good financial shape and would require substantial infusions of cash to regain fiscal stability. Fairchild decided that the potential benefits justified the attendant risks and embarked on a plan to assist in returning Air Kentucky to financial health.

As part of its effort to revitalize Air Kentucky, Fairchild sold three aircraft to Air Kentucky during the summer of 1988, on terms favorable to the purchaser. These aircraft were financed through a leasing scheme partially guaranteed by Fairchild (eventually Fairchild was required to make all lease payments it had guaranteed under this scheme).

Fairchild also provided Air Kentucky with a used aircraft in 1988 for which Fairchild was never compensated. Finally, during 1988, Fairchild loaned approximately $5 million to Air Kentucky as operating funds, an amount Fairchild had to write off as uncollectible in January, 1989.

Fairchild was a subsidiary of Metro Aviation, Inc. ("Metro"), which in turn was a subsidiary of Gene Morgan Financial, Inc. ("GMFI"). In January 1989, GMFI purchased two-thirds of the stock of Air Kentucky's parent corporation, MPM Holding Corporation ("MPM"). Metro already owned

the other one third of MPM. As a result, Air Kentucky and Fairchild became affiliated entities (although neither one owned stock in the other), with GMFI as the parent corporation of both, albeit indirectly through ownership of Metro and MPM.

Fairchild and GMFI's plan to strengthen Air Kentucky was stymied by USAir when it objected to GMFI's owning a controlling interest in Air Kentucky. As a matter of policy, USAir did not want the parent company of an aircraft manufacturer controlling a commuter airline with which USAir was affiliated. For that reason, Air Kentucky was advised by USAir that it was terminating its code-sharing agreement with Air Kentucky effective July 15—an occurrence that would surely be the death knell of Air Kentucky. Based on representations made by USAir, Fairchild viewed the time remaining until the July 15th deadline as a probationary period in which to revive Air Kentucky operationally and sell it. A more immediate threat emerged, however, when Air Kentucky's fuel suppliers refused to provide any further fuel on credit.

Fairchild's Chairman, Kopko, realized that the loss of Air Kentucky's fuel supply would force its immediate grounding and just as immediate demise. This sudden termination was unacceptable to Fairchild; it would be certain to cause Fairchild serious harm. According to Kopko, the death of Air Kentucky would not only have destroyed any hope Fairchild had of selling new aircraft to Air Kentucky, its end also would have seriously damaged Fairchild's long-term relationship with USAir. Fairchild knew that USAir expected substantial advance notice of any break in operations from its commuter airlines. Fairchild also had reason to believe that it would be held accountable by USAir for such a break, given Fairchild and GMFI's involvement in the ownership and operations of Air Kentucky. In addition, a sudden shutdown of Air Kentucky would have forced Fairchild to take back the three aircraft it had leased to Air Kentucky, an event that Fairchild believed would have adversely affected the sales of new aircraft.

To keep Air Kentucky in operation (and thus marketable to a buyer who might turn it around) Kopko contacted Tom Comeau, the president of Butler, and asked if it would provide fuel to Air Kentucky. Comeau told Kopko that Butler would not supply fuel to Air Kentucky on credit, but would be willing to arrange for fuel to be furnished Air Kentucky if it could bill Fairchild for the fuel

plus a fuel management fee of $5,000 a month.[1]  Apparently Fairchild and Butler orally agreed to these terms, but never reduced their agreement to writing.

Pursuant to this oral agreement, Butler purchased fuel and delivered it to Air Kentucky, and sent invoices to Fairchild.  In response, Fairchild made 17 payments to Butler from February 1989 to August 1989, totaling $432,380.91, for fuel provided from February to May of that same period.[2]

---

[1]For reasons not apparent to us (and that are not germane to this appeal) Comeau, instead of agreeing to sell fuel directly to Air Kentucky, structured the transaction so that Butler purchased and delivered the fuel to Air Kentucky and then billed Fairchild for those fuel purchases plus a managing fee of $5,000 a month.

[2]The dates and amounts of the 17 payments are as follows:

| Date Paid | Amount Paid |
| --- | --- |
| 2/03/89 | $19,118.40 |
| 2/14/89 | 9,893.74 |
| 2/16/89 | 23,251.17 |
| 2/17/89 | 9,417.44 |
| 2/22/89 | 19,226.89 |
| 3/06/89 | 23,491.65 |
| 3/08/89 | 13,526.40 |
| 3/10/89 | 15,596.52 |
| 3/16/89 | 13,194.84 |
| 4/11/89 | 61,666.59 |
| 4/18/89 | 22,648.47 |
| 5/05/89 | 26,857.55 |
| 5/11/89 | 41,739.74 |
| 5/23/89 | 18,153.66 |
| 6/05/89 | 10,080.37 |
| 6/09/89 | 14,517.48 |
| 8/01/89 | 90,000.00 |

The first 14 of those payments, remitted between February 3 and May 23, 1989, totaled $317,783.06. In addition to payments made to Butler, Fairchild advanced Air Kentucky approximately $3,650,000 in the period of January through May 1989. Fairchild wrote off these advances as uncollectible for each month in which they were made.

On May 15, 1989, GMFI agreed in principle with Reed Industries, Inc. ("Reed") for Air Kentucky to be purchased by Reed or a related subsidiary or affiliate. Under this agreement, Reed would assume the lease obligations guaranteed by Fairchild and promise to purchase three new Fairchild aircraft. Fairchild believed that Reed would purchase additional aircraft if it were successful in operating Air Kentucky at a profit.

The sale to Reed was never consummated, however. Sometime after May 15, 1989, USAir informed GMFI that it would not permit the transfer of the code-sharing agreement to Reed. Air Kentucky ceased operations on May 31, 1989. Nine months later, on February 1, 1990, Fairchild voluntarily filed for protection under Chapter 11 of the Bankruptcy Code.

In September, 1990, the bankruptcy court appointed Whyte as Fiscal Agent for Fairchild. As authorized by the court, Whyte pursued avoidance actions on behalf of the unsecured creditors of Fairchild. She filed a complaint to recover the entire $432,380.91 paid by Fairchild to Butler for the fuel that Butler had provided for Air Kentucky. Whyte also sought to avoid any alleged oral guaranty between Fairchild and Butler regarding the provision of that fuel. She asserted several theories to achieve her objectives, the one pertinent to this appeal being that Fairchild did not receive "reasonably equivalent value," within the meaning of § 548 of the Bankruptcy Code, for those fuel payments.[3]

After a two-day trial, the bankruptcy court concluded that Fairchild did derive "reasonably equivalent value" for payments made during the time the fuel kept Air Kentucky in operation. The court also held that, inasmuch as the guaranty was oral, it was legally unenforceable. As Butler presumably would not have continued to acquire fuel for Air Kentucky absent Fairchild's payments, the bankruptcy court concluded that payments made while Air Kentucky was flying were for reasonably equivalent value. The court reasoned, however, that as the oral guaranty was legally

---

[3] 11 *U.S.C.* § 548(a)(2)(A).

unenforceable, Fairchild derived no equivalent value from payments made after Air Kentucky ceased operations. Accordingly, the bankruptcy court entered judgment ordering Butler to repay the total of $114,597.85 received as fuel payments from Fairchild after Air Kentucky stopped flying.

On appeal to the district court, Butler argued that the guaranty was enforceable under either the "part performance" or "main purpose" doctrine. The district court rejected both contentions. That court concluded that the part performance doctrine was waived because Butler failed properly to present this issue to the bankruptcy court. The district court also concluded that the bankruptcy court was not clearly erroneous in finding that Air Kentucky, not Fairchild, was the primary obligor on this guaranty—a finding that negated the applicability of the main purpose doctrine. Finally, the district court agreed with the bankruptcy court that Fairchild derived reasonably equivalent value for fuel payments made while Air Kentucky was still flying but not thereafter. Accordingly, the district court entered judgment affirming the bankruptcy court in all respects. Butler timely appealed and Whyte timely cross-appealed.

II

DISCUSSION

A. *Air Kentucky's Continued Operation as Reasonably Equivalent Value*

In *Durrett v. Washington National Insurance Co.,*[4] we held that we review de novo the issue whether a debtor received reasonably equivalent value. Even though application of de novo review to this question can be troubling,[5] we nonetheless remain bound by our decision in *Durrett* and thus

---

[4]621 F.2d 201, 203 (5th Cir.1980); *see also In re Besing,* 981 F.2d 1488, 1494 n. 12 (5th Cir.1993) (noting that although some confusion exists over the appropriate standard of review, *Durrett* "clearly held" that the standard is de novo).

[5]Such review is contrary to precedent in other circuits: The First and the Eighth Circuits apply a clearly erroneous standard of review to this issue, *In Re Roco Corp.,* 701 F.2d 978, 981-82 (1st Cir.1983); *In Re Ozark Restaurant Equipment Co.,* 850 F.2d 342, 344 (8th Cir.1988); the Seventh Circuit gives "great deference" to the trial court, *In Re Bundles,* 856 F.2d 815, 825 (7th Cir.1988); and the Second Circuit concluded that fairness of consideration is generally a question of fact. *Klein v. Tabatchnick,* 610 F.2d 1043, 1047 (2d Cir.1979). Such review is also contrary to the clear error standard we use to review determinations of valuation in other contexts. *E.g., Lukens v. C.I.R.,* 945 F.2d 92, 96-97 (5th Cir.1991) (valuing real estate to determine deductibility of interest payments); *In Re Delta Towers, Ltd.,* 924 F.2d 74, 78 (5th Cir.1991) (ascertaining going concern value of a business to determine whether to charge the bankruptcy estate with administrative expenses); *Piney Woods Country Life School v. Shell Oil Co.,* 905 F.2d 840, 843-

continue to apply de novo review. Fortunately, the outcome of the inquiry in the instant case would be the same regardless of whether we were to apply the de novo or the clear error standard. As for the fact-finding that underlies the valuation issue, we review for clear error only.[6]

Although the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value.[7] In determining whether Fairchild derived such value by paying for Air Kentucky's fuel, we first observe that the aggregate amount paid is uncontested: $432,380.91. We must also observe, though, that Fairchild's decision to purchase fuel must be evaluated as of the time it was made and during the time it was implemented—from the beginning of January through May, 1989—and then only to the extent of the precise decision actually made, which was to spend between $16,000-$20,000 a week to keep Air Kentucky flying until a buyer could be found.[8] Thus, the issue is whether keeping Air Kentucky operating during this period was worth $16,000-$20,000 a week, or its "reasonable equivalent," to Fairchild. Like the bankruptcy and district courts before us, we

---

44 (5th Cir.1990) (ascertaining market value of gas to determine whether lessors were properly paid royalties due); *Stewart v. C.I.R.,* 902 F.2d 446, 446 (5th Cir.1990) (valuing leaseholds to determine proper charitable deduction). Moreover, valuing consideration received is inherently fact-laden, turning, as it often does, on the case-specific circumstances surrounding the debtor's decision to enter the particular transaction. *E.g., In Re Bundles,* 856 F.2d at 824-25 (noting same). Reviewing such fact-laden inquiries normally requires appropriate deference to the trial court, which is most familiar with those circumstances. *See, In Re Coston,* 991 F.2d 257, 261 (5th Cir.1993) (noting same in context of inquiry into reasonableness of a debtor's reliance). Indeed, similar considerations led the *Coston* court to recently reverse our precedent applying de novo review to the issue of whether a debtor's reliance was reasonable under the Bankruptcy Code—a decision that calls into doubt the continued soundness of *Durrett. Id.* at 262.

[6]FED.R.CIV.P. 52(a).

[7]In *Durrett* we held that receipt of 57.47 of the consideration given could not constitute reasonably equivalent value, but implied in dictum that receipt of 707 might constitute such value. *Durrett,* 621 F.2d at 203. Many bankruptcy courts have construed *Durrett* as espousing a mechanical test with a 707 cut-off point, although this is clearly incorrect. *See, In Re Besing,* 981 F.2d at 1495 n. 14 (noting same); *FDIC v. Blanton,* 918 F.2d 524, 531 n. 7 (5th Cir.1990) (same). Other circuits have rejected any mechanical test to ascertain the lower limit of reasonably equivalent value, opting instead for a "totality of the circumstances" approach. *In Re Besing,* 981 F.2d at 1495 n. 14.

[8]*See, In Re Morris Communications NC, Inc.,* 914 F.2d 458, 466 (4th Cir.1990) (noting that appropriate time to evaluate the value given for a payment is at the time the payment is made); *see also, Collier on Bankruptcy,* § 548.09 at p. 116 (15th Ed. 1984) (noting same).

conclude that it was.

We note initially that Fairchild derived several immediate benefits from keeping Air Kentucky in operation during the relevant period. First, Fairchild avoided having to take back three aircraft that it had previously sold to Air Kentucky; such a return would have been likely to disrupt Fairchild's sale of new aircraft—at $800,000 profit per plane—as Fairchild would have needed to dispose of this inventory of used planes. Second, any sudden cessation of Air Kentucky's operations would have seriously damaged Fairchild's relationship with USAir, a potential major customer. USAir required substantial advance notice of any break in operations caused by loss of a connecting airline such as Air Kentucky. Given Fairchild's involvement in the financing and continued operation of Air Kentucky, USAir would likely have attributed to Fairchild any resultant harm suffered by USAir from such a precipitous stoppage in service.

We next note that keeping Air Kentucky flying kept it marketable, a posture highly desirable to Fairchild. For if a suitable buyer could be found, then Fairchild would have an opportunity to recoup at least some of the millions it had invested in Air Kentucky—as well as to sell it more new aircraft in the future. Under the circumstances, we agree that Fairchild took a risk that generated cognizable value. As already noted, the rewards from a sale of Air Kentucky would have been high and the likelihood that a sale would occur was also demonstrably high. After all, by the middle of May, Fairchild had acquired Reed as a buyer. Reed had agreed to purchase Air Kentucky, to assume Fairchild's lease obligations on the three aircraft already acquired by Air Kentucky, and to purchase three new aircraft from Fairchild—an agreement that would have compensated Fairchild handsomely for its investment in fuel, and one that could not have occurred but for that investment. Although this sale was unexpectedly derailed by USAir (which refused to permit the transfer of the all-important code-sharing agreement from Air Kentucky to Reed), we cannot use hindsight to recalibrate the risk—or the potential reward—of Fairchild's investment.[9]

Finally, we note that Whyte's attempt to foreclose inquiry into the value derived from Air Kentucky's continued operation is misguided. According to Whyte, the only value that can be

[9]*See, e.g., In Re Morris,* 914 F.2d at 466.

considered is property actually received. Under this view the value of an investment—no matter how large and how probable the potential return—cannot be considered unless it actually pays off, and only to the extent that it does so. Under such a postulation, anyone who provides, deals with, or invests in an entity in financial straits would be doing so at his or her peril under § 548; which means, of course, that few would be likely to do so.

The narrow "realized property" approach to value advanced by Whyte finds no approbation in the law. Rather, the recognized test is whether the investment conferred an economic benefit on the debtor;[10] which benefit is appropriately valued as of the time the investment was made.[11] Courts have considered such indirect financial effects as, for example, the synergy realized from joining two enterprises,[12] the increase in a credit line,[13] and the increased monetary "float" resulting from guarantying the loans of another,[14] as constituting value received under § 548. We conclude that, when viewed within the appropriate frame of reference, the benefits flowing to Fairchild from keeping Air Kentucky in operation is likewise value for purposes of § 548. And, as discussed above, we also conclude that, for purposes of § 548, the value realized by Fairchild for fuel payments made while Air Kentucky was still flying was sufficient to constitute reasonably equivalent value.

B. *Enforceability of the Oral Guaranty*

Even as we agree with the bankruptcy and district courts that Fairchild's fuel payments produced reasonably equivalent value by ensuring Air Kentucky's continued operation, we also agree that such function ceased on May 31, 1989. Thus, Fairchild could only claim receipt of value for

---

[10]*In Re Rodriguez,* 895 F.2d 725, 727 (11th Cir.1990); *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991 (2d Cir.1981).

[11]*E.g., In Re Morris,* 914 F.2d at 466.

[12]*Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 647-48 (3rd Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).

[13]*Id.*

[14]*Rubin,* 661 F.2d at 992-94.

payments made after May 31 if those payments were made to reduce a legally enforceable debt.[15]

Butler does not dispute on appeal that it only acquired an oral guaranty from Fairchild, and that an oral guaranty is generally unenforceable under the Texas statutory version of the common law Statute of Frauds.[16] Instead, Butler attempts to find enforceability for this oral guaranty by fitting it within either of two doctrinal exceptions: "main purpose" or "part performance."

### 1. *"Main Purpose" Doctrine and Primary Obligor.*

Under Texas law, an oral guaranty may be enforced if it falls within the "main purpose" doctrine. An oral guaranty falls within this doctrine if:

> 1) The promisor intended to become primarily liable for the debt, in effect making it his original obligation, rather than to become a surety for another;
>
> 2) There was consideration for the promise; and
>
> 3) Receipt of the consideration was the promisor's main purpose or leading object in making the promise; that is, the consideration given for the promise was primarily for the promisor's own use and benefit.[17]

In the instant case, the bankruptcy court found that Fairchild was not primarily liable on the debt—thus rendering the main purpose doctrine inapplicable. The district court concluded that this finding was not clearly erroneous.

Like the district court, we review the bankruptcy court's finding on this issue only for clear error.[18] "A finding of fact is clearly erroneous "when although there is evidence to support it, the

---

[15]Fairchild made three payments after May 31 totaling $114,597.85. The dates and amounts of those payments are as follows:

| Date Paid | Amount |
|-----------|-----------|
| 6/05/89 | $10,080.37 |
| 6/09/89 | 14,517.48 |
| 8/01/89 | 90,000.00 |

[16]*See,* TEX.BUS. & COM.CODE ANN. § 26.01(a), (b)(2) (Vernon 1987).

[17]*E.g., Haas Drilling Co. v. First National Bank,* 456 S.W.2d 886, 890 (Tex.1970); *Smith, Seckman, Reid, Inc. v. Metro Nat'l Corp.,* 836 S.W.2d 817, 820-21 (Tex.App.—Houston [1st Dist.] 1992).

[18]*See, e.g., In Re Fabricators, Inc.,* 926 F.2d 1458, 1464 (5th Cir.1991).

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' "[19] And the clearly erroneous rule should be strictly applied when, as here, a district court has affirmed factual findings of a bankruptcy court.[20]

We too conclude that the bankruptcy court did not clearly err in finding that Fairchild was not the primary obligor on the fuel contract with Butler, even though the evidence on this issue is equivocal at best. For example, although Butler's president, Comeau, testified that Fairchild was primarily responsible for the debt, several of Butler's internal documents indicate that payments were to be made by Air Kentucky. George Williamson, the Chief Financial Officer of Fairchild, testified that a letter stating that Butler is "looking for reimbursement from Air Kentucky" reflected his understanding of the agreement between Fairchild and Butler; he also testified that there was never any question in his mind that Air Kentucky was the account debtor. In contrast, the record discloses that the fuel bills were sent directly to Fairchild for payment. Finally, we must note (as did the bankruptcy court) that the direct consideration received for the oral guaranty was fuel delivered to Air Kentucky for its use, not Fairchild's use—a fact that, under standard commercial practices, militates against finding Fairchild as the primary obligor. When considered in toto, though, we find that there was sufficient evidence to immunize the fact finding of the bankruptcy court from reversal as clear error.

### 2. *"Part Performance" Doctrine and Waiver.*

The district court concluded that Butler waived any appeal to the part performance doctrine by failing properly to present this issue first to the bankruptcy court.[21] In contending that the district court erred in finding waiver, Butler asserts that it did raise this doctrine in a response to a motion

---

[19] *In Re Missionary Baptist Foundation,* 818 F.2d 1135, 1142 (5th Cir.1987) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

[20] *E.g., In Re Fabricators,* 926 F.2d at 1464; *In Re Missionary Baptist Foundation,* 818 F.2d at 1142.

[21] *See, e.g., In Re Gilchrist,* 891 F.2d 559, 561 (5th Cir.1990) (noting that "[i]t is well established that [reviewing courts] do not consider arguments or claims not presented to the bankruptcy court").

for summary judgment. According to Butler, this doctrine was presented by implication through the cases Butler cited to the bankruptcy court in connection with that motion. We find Butler's argument too thin to bear the weight of its contention.

Citing cases that may contain a useful argument is simply inadequate to preserve that argument for appeal; "to be preserved, an argument must be pressed, and not merely intimated."[22] In short, the argument must be raised to such a degree that the trial court may rule on it[23]—a standard that clearly was not met in the instant case. The argument here was not even identified by name, much less advocated.

Butler's case-cite-as-argument rationale is even more dubious when viewed in the context within which the case citations were made. Butler cited these cases in connection with its advocacy of the theory that full performance by the parties took this oral guaranty out of the Statute of Frauds and thus made it enforceable. That full performance removes an agreement from the aegis of the Statute of Frauds is true.[24] But this maxim is not relevant to the issue at hand. Rather, the bankruptcy court had to determine whether the oral guaranty was enforceable *at the time the payments were made* to determine whether those payments constituted reasonably equivalent value under § 548. Butler's misdirected appeal to a doctrine applicable only *after* those payments were made could hardly have provided the bankruptcy court with notice that Butler intended to invoke the part performance doctrine—one that, as noted, applies when ascertaining enforceability of the guaranty at the time those payments were made.[25]

---

[22]*Hays v. Sony Corp.,* 847 F.2d 412, 420 (7th Cir.1988), *see also, In Re Espino,* 806 F.2d 1001, 1002 (11th Cir.1986) (holding that a cursory presentation constitutes waiver).

[23]*Whittaker Corp. v. Execuair Corp.,* 953 F.2d 510, 515 (9th Cir.1992) (stating that such an approach accords the trial court the opportunity to correct any errors).

[24]*E.g. Pou v. Dominion Oil Co.,* 265 S.W. 886, 888 (Tex.1924) (holding that full performance takes a contract out of the Statute of Frauds); *Howell v. Bowden,* 368 S.W.2d 842, 846 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.) (same).

[25]As its name implies, the part performance doctrine works to remove an oral contract from the coverage of the Statute of Frauds when one side, but not the other, has substantially performed the contract. Thus this doctrine applies when refusal to enforce the agreement would operate as a virtual fraud because the party relying on the agreement suffered substantial detriment without a remedy absent enforcement, and the other party would reap an unearned

III

CONCLUSION

By paying Butler for fuel to keep Air Kentucky flying, Fairchild was able to continue its cordial relations with a major customer, avoid the return of three aircraft, and hold open the possibility of receiving substantial benefits from the sale of Air Kentucky. We agree with the bankruptcy and district courts that these benefits constituted reasonably equivalent value under § 548 for fuel payments made while Air Kentucky was flying.

Once Air Kentucky ceased operations, however, Fairchild could have received value for its fuel payments only if those payments reduced a legally enforceable debt. We conclude that Butler failed to fit this oral guaranty within the main purpose doctrine, a recognized exception to the Statute of Frauds, so as to make the guaranty enforceable. Butler failed to show that the bankruptcy court clearly erred in finding that Fairchild was not the primary obligor on that guaranty. Consequently, the main purpose doctrine was inapplicable. And Butler's failure to do more than cite cases that may have addressed the part performance doctrine operated to waive any appeal based on that doctrine.

We thus conclude, as did the bankruptcy and district courts, that payments made after Air Kentucky ceased operations were not for reasonably equivalent value. Consequently, those post-operation payments received by Butler must be paid over to Whyte as Fiscal Agent for the benefit of Fairchild's unsecured creditors.

For the foregoing reasons, the judgment of the bankruptcy court is

AFFIRMED.

---

benefit or windfall if permitted to plead the statute. *E.g., Carmack v. Beltway Development Co.,* 701 S.W.2d 37, 40 (Tex.App.—Dallas 1985, no writ); *Estate of Kaiser v. Gifford,* 692 S.W.2d 525, 526-27 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (collecting cases).