REVISED NOVEMBER 1, 2002
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-30454

_____

In the matter of: Hannover Corporation; Redwood Raevine Corp.;
Rubicon XI Corp.; Place Vendome, Inc.; Place Vendome Corporation
of America; Penzance, Inc.; and ATG, Inc., Debtors

JIMMY SWAGGART MINISTRIES,

Appellant,

versus

WILLIAM G. HAYS, JR.,

Appellee.


WILLIAM G. HAYS, JR.,

Appellee,

versus

JIMMY SWAGGART MINISTRIES,

Appellant.

_____

Appeals from the United States District Court
for the Middle District of Louisiana

_____



_____

No. 01-30455

_____

In the matter of: Hannover Corporation; Redwood Raevine Corp.; Rubicon XI Corp.; Place Vendome, Inc.; Place Vendome Corporation of America; Penzance, Inc.; and ATG, Inc., Debtors

WILLIAM G. HAYS, JR.,

Appellee,

versus

GEORGE M. RUSSELL; JIMMY SWAGGART MINISTRIES,

Appellants.

JIMMY SWAGGART MINISTRIES,

Appellant,

versus

WILLIAM G. HAYS, JR.,

Appellee.

_____

Appeals from the United States District Court
for the Middle District of Louisiana

_____

October 29, 2002

Before DAVIS, JONES and SMITH, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This is an adversary proceeding brought by William G.

Hays, Jr. ("Hays"), trustee of the debtors' bankruptcy estate, to

2

recover $2,472,500 paid by the debtors to Jimmy Swaggart Ministries ("JSM") from July 1990 to July 1992. Hays argues — and JSM contests — that these transfers can be avoided as actual and/or constructive fraudulent conveyances under 11 U.S.C. § 548(a). JSM additionally claims the "good faith" defense of 11 U.S.C. § 548(c). For the reasons that follow, this court finds that JSM met the requirements of § 548(c) and the criteria for a comparable defense under Louisiana law. Accordingly, we need not reach the other issues raised on appeal. The district court's 1999 reversal of the bankruptcy court's 1995 judgment must be reversed, and judgment must be entered in favor of JSM.

## FACTS

The debtors in this case are a number of corporations created and controlled by Sam J. Recile ("Recile") for the purpose of developing a shopping mall in Baton Rouge, Louisiana. Critical to the success of this project was Recile's acquisition of a tract of land owned by JSM. In July 1990, one of Recile's corporations entered into an option agreement for purchase of a 68-acre tract of JSM's land in Baton Rouge, Louisiana. The stipulated purchase price was $11,250,000. For the next two years Recile made payments totaling $2,435,000 on this and subsequently renegotiated agreements as he sought to obtain financing for the project. No purchase ever occurred.

3

Although call option contracts on real estate are common enough, Recile's behavior was not. He offered to prospective investors short-term double-your-money-back promissory notes to finance his project. The nominal party on Recile's side of the option arrangement changed frequently. Payments to JSM were, in later stages of the relationship, made on a weekly or daily basis — sometimes in cash, sometimes with counter-signed third-party checks. Most notably, Recile came under SEC investigation, a complaint being filed in April 1991 in the United States District Court for the Eastern District of Louisiana. JSM was not a party to this action.

Over the next fifteen months the supervising district judge issued a variety of orders, each of which allowed the debtor corporations to continue making payments on this and other options. Eventually, in July 1992, the court entered an order granting the SEC broad injunctive relief that, among other things, appointed Hays as receiver for the debtors. See SEC v. Recile, 10 F.3d 1093 (5th Cir. 1993) (affirming district court's grant of SEC's motion for summary judgment). In September 1992, Hays filed voluntary Chapter 11 bankruptcy petitions on behalf of the debtors.

In February 1994, Hays filed this action in bankruptcy court, seeking to avoid a total of $2,472,500 in pre-petition payments made by the debtors to JSM. Following an extensive bench trial with multiple witnesses, Judge Jerry A. Brown, the bankruptcy

4

judge, ruled in favor of JSM on all of Hays's claims in this action. The court concluded that, although there was ample evidence that Recile had engaged in illegal activities, there was "no substantial evidence that JSM was a party to, knew of, or was put on notice of sufficient facts, that it should have known of such illegal activities when it accepted the numerous transfers of money and agreed to allow the debtors to tie up valuable real estate for the lengthy amount of time here involved."

Hays appealed to the district court. Three and a half years later, that court reversed and remanded the bankruptcy court's decision. On remand, the bankruptcy court granted Hays's motion for judgment in his favor, but declined to award pre-judgment interest. On appeal, the district court reversed the bankruptcy court's denial of pre-judgment interest. JSM filed notices of appeal to this court, the district court entered an amended judgment, and JSM filed a third notice of appeal. The appeals have been consolidated.[1]

## DISCUSSION

### I. The district court erred in reversing the bankruptcy court's conclusion that JSM had satisfied the elements of the good faith defense under 11 U.S.C. § 548(c).

With 11 U.S.C. § 548(c), Congress provided to transferees a defense against a trustee's (or debtor's) successful

---

[1]The judgments of the district court are final for purpose of appeal.

5

demonstration of an actual or constructive fraudulent transfer under, respectively, § 548(a)(1)(A) and § 548(a)(1)(B) of the Bankruptcy Code. 11 U.S.C. § 548(c) states in pertinent part:

> [A] transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

The burden of proof is on the defendant transferee. See In re M. & L. Bus. Mach. Co., Inc., 84 F.3d 1330 (10th Cir. 1996); In re Agric. Research & Tech. Group, 916 F.2d 528 (9th Cir. 1990). To avail himself of this defense, the transferee must demonstrate that he "[took] value in good faith." To keep what he received, he must subsequently demonstrate that he "gave value."

Hays argues that Recile's corporations made actual and/or constructive fraudulent transfers to JSM under § 548(a). JSM argues that these payments were not fraudulent. It also argues, in the alternative, that it is protected by the defense provision found in § 548(c). Because this court holds that JSM satisfied the terms of § 548(c), we need not undertake an evaluation of Hays's assertion that the transfers were actually and/or constructively fraudulent under § 548(a).

## A. Good Faith

In an appeal from a district court reversal of a bankruptcy court judgment, this court should "perform the same appellate review as did the district court: [the appellate court]

6

examine[s] the bankruptcy court's findings of fact under the clearly erroneous standard, and [the appellate court] examine[s] that court's legal determinations under the de novo standard." In re Sewell, 180 F.3d 707, 710 (5th Cir. 1999).

The dispute regarding JSM's "good faith" under § 548(c) comes to this court as a question of first impression. In the absence of clear factual error or controlling legal precedent, we decline the invitation to overturn the trial court's finding that JSM received Recile's payments in "good faith."

As courts and commentators frequently note, the bankruptcy code does not define "good faith" and the statute's legislative history is quite thin. 5 COLLIER ON BANKRUPTCY ¶548.07[2][a] (2002). Moreover, there is little agreement among courts as to what conditions ought to allow a transferee this defense. Id. This is not surprising, as the variables are manifold.

The most important set of questions concerns the transferee's state of mind. First, what level of knowledge — knowledge itself or some form of notice — vitiates a claim of "good faith"? Second, need the knowledge be actual or merely constructive? Third, what duty of inquiry does notice impose?

The first set of questions begs the second: Knowledge of what? Of the transferor's insolvency, fraudulence, or both? If insolvency, then of what degree — actual, imminent, or potential?

7

If fraudulence, then regarding what transactions — the enterprise involving the transferee or any of the transferor's dealings?

Regarding the second set of questions — the debtor corporations' insolvency and fraudulence — there is no reason to disagree with the bankruptcy court. The debtor corporations were insolvent <u>ab initio</u>. They also made fraudulent representations to investors, though not necessarily at the outset. Moreover, Recile's fraudulence pertained to the JSM land deal itself, not to some unrelated transaction. Without an option on JSM's land, Recile could not have perpetrated his fraud upon his investors. The transferor was engaged in a crooked scheme.

The heart of the bankruptcy court's conclusion lies, then, in the first set of questions — the transferee's state of mind. Once again, the bankruptcy court's findings are comprehensive, cogent, and entitled to the respect due them under the clear error standard. We point here only to the most telling out of a voluminous list of findings. With regard to JSM's knowledge of the debtor corporations' insolvency, the bankruptcy court found that "[a]t the time the transfers occurred, JSM had no way of knowing that the debtors were insolvent." With regard to JSM's knowledge of the debtor corporations' fraudulent activities, Judge Brown found that JSM had read newspaper accounts of the SEC's suit against Recile. Finally, with regard to JSM's duty of inquiry, Judge Brown found that JSM, upon reading — and being duly

8

alarmed by — these newspaper stories, undertook its own investigation, contacting the SEC and the federal district court, eventually receiving assurances from the district court that JSM could continue to receive option payments from Recile's corporations.

Based on its findings, the bankruptcy court's resultant legal conclusion is unproblematic. As noted above, there is little agreement among courts regarding the appropriate legal standard for this defense, because "[t]he unpredictable circumstances in which the courts may find its presence or absence render any definition of "good faith" inadequate, if not unwise." 5 COLLIER ON BANKRUPTCY ¶548.07[2][a]. Compare In re Little Creek Dev. Co., 779 F.2d 1068 (5th Cir. 1986) (interpreting good faith in context of Chapter 11's availability). This court has lacked either occasion or disposition to attempt to formulate such a definition for purposes of § 548(c). Moreover, the atypical posture of the fraudulent conveyance claim here, i.e., the debtor's payments to an unaffiliated third party in an arms-length transaction, counsels caution in attempting to propound a broad rule concerning "good faith" for § 548(c). It is enough for present purposes to rely on the bankruptcy court's conscientious findings and conclusion.

B.    **Value**

This court has not yet had occasion to articulate the standard for appellate review of trial court determinations of

9

"value" under § 548(c). As the parties to this case do not dispute this point, we adopt for present purposes this court's approach to the review of trial court determinations of "reasonably equivalent value" under § 548(a)(2). See In re Wes Dor, Inc., 996 F.2d 237, 242 (10th Cir. 1993). The question of valuation under § 548(a) is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." In re Dunham, 110 F.3d 286, 290 (5th Cir. 1997) (internal quotations omitted). That being said, "we review de novo the methodology employed by the bankruptcy court in assigning values to the property transferred and the consideration received." Id. at 290 n.11.

Section 548(c) allows a transferee who "takes for value" to retain this transfer to the extent that he "gave value to the debtor in exchange." It is undisputed that JSM "[took] for value"; Hays contends, however, that JSM "gave" no "value" in return. The bankruptcy court disagreed with Hays but the district court did not. Because the bankruptcy court's findings of fact are supported by the record and its conclusions of law are consistent with the text of the Bankruptcy Code, the Code's interpretation by this and other courts, and sound commercial practice, we reverse the district court's reversal.

This court is presented with two questions, one of law, the other of fact. Of Law: Did the bankruptcy court correctly conclude that the transferee's sale of short-term call options to

10

a party unable to exercise them have "value" under § 548(c)?  Of Fact: Did the bankruptcy court correctly conclude that this was an equitable exchange?  We answer both in the affirmative.

The arc of § 548 easily encompasses as "value" the present exchange of cash for a right to buy or sell property at a future point in time.  Courts are understandably chary of interpreting § 548 to regard promises of future support as "valuable."  Without consideration, courts suspect gratuitous transfer rather than contractual exchange.  See 5 COLLIER ON BANKRUPTCY ¶548.05[1][b].  This court is not, however, willing to regard as without "value" all transactions in which present cash is exchanged for a right of future exercise.  See In re Fairchild Aircraft Corp., 6 F.3d 1119 (5th Cir. 1993).  To do otherwise would require rejection of our caselaw as well as the economic realities of options markets.

Hays, nonetheless, requests something of the sort.  Hays has argued that these options had no "value" because there was no possibility that Recile would ever exercise them.  To determine whether the debtor received "value," the district court held that courts

> must consider the circumstances that existed at the time and determine if "there was any chance that the investment would generate a positive return."  If there was no such chance at the time of the transfers that the payments would generate a positive return, then no value was conferred.

11

District Court Opinion at 12 (quoting In re R.M.L., Inc., 92 F.3d 139, 152 (3d Cir. 1996)).  Hays asserts that, because of the fraudulent character of Recile's project, there was no chance that he would ever exercise this option.  This option, therefore, had no "value."

Hays's legal argument is flawed for three reasons.

First, it contradicts the bankruptcy court's finding that Recile's development project began as a legitimate real estate venture, turning into a Ponzi scheme only in its subsequent stages.

Second, its adoption would, by permitting the exercise of judgment in hindsight, conflict with basic economics and with Fifth Circuit caselaw.  Like all speculative financial instruments, the value of an option can change over time, depending upon the value of the underlying property.  This is their nature; options are bought and sold precisely to speculate on or hedge against market fluctuation.  Without more, the fact that an option has become worthless in no way proves that it was worthless at an earlier date.  Thus, consistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one, such as we have before us now, is to be determined at the time of purchase.  See Fairchild, 6 F.3d 1126-27; In re Chomakos, 69 F.3d 769, 770 (6th Cir. 1995); see also 5 COLLIER ON BANKRUPTCY ¶548.02[2].

12

Third, and critically, Hays's position would subvert the defensive character of § 548(c), a clause specifically designed to protect transferees, not transferors.  5 COLLIER ON BANKRUPTCY ¶548.07. We fully appreciate the problem that appears to trouble the district court:  Under the guise of a negotiated contract, a debtor anticipating bankruptcy can transfer valuable properties for consideration of lesser worth.  The problem is even more acute in the case at bar, where the consideration is alleged to be wholly without value.

Although we share this concern, § 548(c) is not the test that Congress has established to extirpate this form of fraud.  The Bankruptcy Code looks, rather, to the "reasonable equivalency" test found at § 548(a)(1)(B)(i).  In order to establish a *prima facie* case for avoiding a transfer as constructively fraudulent, the trustee must demonstrate that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation."  Id.  This provision ensures that there is no great disparity between the value of the goods exchanged.  But it does so, most importantly, from the perspective of the transferor: Did the transferor "receive[]" enough?  See Fairchild, 6 F.3d at 1127 ("the recognized test is whether the investment conferred an economic benefit on the debtor").

Compare this with the provision at § 548(c).  Instead of inquiring into the possibility and extent of the debtor's loss, it

13

provides a means by which the unwitting trading partner can protect himself. Received property can be retained "to the extent" that the "transferee . . . gave value to the debtor." The provision looks at value from the perspective of the transferee: How much did the transferee "give"? The concern here, quite properly, is for the transferee's side of the exchange, not the transferor's gain.

Read in combination, §§ 548(a) and (c) are perfectly complementary. The first section affords creditors a remedy for the debtor's fraudulence or, as the case might be, mere improvidence; the second protects the transferee from his unfortunate selection of business partners. See Fairchild, 6 F.3d at 1126-27 (rejecting the proposition that "anyone who provides, deals with, or invests in an entity in financial straits would be doing so at his or her peril under § 548"). Each party can make a claim for cure, but only to the extent it was harmed. On account of the allegedly thoroughgoing fraudulent character of Recile's development project, Hays asks this court to reject JSM's § 548(c) defense. We decline to do so, however, because (1) call options do indeed have value, (2) their values are to be determined at the time of origination, and (3) a transferor's practical inability to exercise his option is irrelevant to its valuation under § 548(c).[2]

---

[2]      Hays also argues that these options — at least those of a days or weeks term — had no value on account of their exceedingly short duration. We find this argument without merit, both theoretically and practically. Although an option of a day's

14

The crucial fact question for our analysis is thus whether the bankruptcy court clearly erred in finding that JSM "gave value" under § 548(c). After a careful review of the evidence presented to the bankruptcy court, this court concludes that it did not so err.

On the basis of testimony offered by JSM's expert witness, Dr. Rodolfo Aguilar, the bankruptcy court found that JSM was "reasonabl[y] compensat[ed]" for the option it sold to Recile:

> The transfers to JSM were made for good and valuable consideration — in exchange for the transfers, the debtors received the option to buy the property, a very valuable asset. JSM owned valuable commercial property and wished to sell it to the debtors. The debtors were attempting to construct a shopping mall complex and desired to purchase the property. The debtors paid JSM reasonable compensation for the options and rights to property which resulted in the property being "tied up" for over two years.

Bankruptcy Court Opinion at 46-47; see also id. at 50 & 59.

Hays argues that the court erred in accepting conclusions based upon a flawed methodology, to wit, taking the sales price as recorded in the option contracts and the moneys received by JSM,

---

duration seems unusually short in light of the relatively greater time required to execute a real estate sale, a short life does not ipso facto negate the value of a financial instrument. More convincing to this court is the practical context from which this unusual practice emerged. The bankruptcy court found that daily payments emerged not from JSMs desire to create day-to-day option contracts but, rather, from Reciles lack of adequate financing. Instead of turning away this prospective purchaser, JSMs indulged Reciles request for daily payments. This court respectfully rejects Hays insistence that no good deed go unpunished.

15

determining the rate of return, and comparing this rate with those yielded by financial instruments of similar qualities. On the basis of the contract price of $11,250,000 and totaled receipts of $2,435,000, Dr. Aguilar concluded that JSM's rate of return was 8.64%, a rate which, he testified, was below that which could have been garnered by other similar investments. If anybody was disadvantaged in its deal, it was JSM, not Recile.

If this were the sum total of Dr. Aguilar's testimony, this court would be inclined to agree with Hays, for, as he correctly notes, the validity of Dr. Aguilar's conclusion rests upon the fairness of the underlying contract price. Absent a finding of the fairness of its value, it is impossible to determine the fairness of the option payments. The record demonstrates, however, that the bankruptcy court fully understood the method-ological problem that Hays presents and that it obtained satisfactory evidence to assuage any concerns.

After hearing Dr. Aguilar's opinion that the rate of return was indeed inferior to similar investment vehicles, Judge Brown pointedly articulated the missing element of Dr. Aguilar's calculation, and encouraged the attorneys to produce evidence regarding the fairness of the contract price. Dr. Aguilar thereupon testified that he believed that the contract prices set forth in the purchase agreements were reasonable, and presented extensive details upon which he based his conclusion, including,

16

but not limited to, JSM's subsequent sale of an option to another developer.

Hays produced no expert testimony, either to prove that Recile "received less than a reasonably equivalent value" under § 548(a) or rebut JSM's claim that it "gave value" under § 548(c).

Absent contrary evidence regarding the valuation of JSM's property, the bankruptcy court was justified in finding that JSM did not part with a right worth less than what Recile had paid for it.

## II.   JSM satisfied the "regular course of . . . business" defense under LA. CIV. CODE art. 2040 (West 2001) to a revocatory action under art. 2036.

In a manner similar, but not identical, to § 548 of the federal Bankruptcy Code, the Louisiana Civil Code provides trustees with a tool for avoiding fraudulent conveyances from debtors. To avoid such a transfer, the trustee must demonstrate (1) that the transfer was "made or effected after the right of the obligee [trustee] arose" and (2) that the transfer "causes or increases the obligor's [debtor's] insolvency."  LA. CIV. CODE art. 2036 (West 2001).  The Code also provides trading partners with an absolute defense: "An obligee [trustee] may not annul a contract made by the obligor [debtor] in the regular course of his business."  Id., art. 2040 (West 2001).

The bankruptcy court concluded that Hays had satisfied the second prong of art. 2036 but said nothing regarding the first.

17

It also concluded that JSM satisfied the "ordinary course of business" defense under art. 2040 and, accordingly, rejected Hays's claim. The district court affirmed the bankruptcy court's holding regarding the second prong of art. 2036 and concluded, further, that Hays had satisfied the first prong. Additionally, the district court held, on the basis of its own findings regarding Recile's fraudulence and JSM's bad faith, that it could not find that "Recile and the debtors were acting in the ordinary course of business."

Because this court upholds the bankruptcy court's finding that Recile's transfers to JSM were made "in the regular course of his business," we need not undertake an evaluation of Hays's art. 2036 claim. Furthermore, because this court rejects the district court's <u>de novo</u> finding of bad faith on the part of JSM, the only remaining question is whether Recile's fraudulence vis-a-vis his investors deprives JSM of his art. 2040 defense.

This court reads art. 2040 to encompass within the terms "regular course of his business" Recile's corporations' payments to JSM. The Louisiana Supreme Court has consistently let stand transactions between debtors and their trading partners, provided that the partners are not also creditors. In the most proximate case — factually and chronologically — the Louisiana Supreme Court held that "'[a] sale made to *one not a creditor* must be considered as one made in the ordinary course of business, if made for an

18

adequate consideration *in cash*.'" <u>Hirsch v. Fudickar</u>, 9 So. 742, 744, 43 La. Ann. 886, 891, 1891 LEXIS 424, 6 (1891), reh'g denied and holding clarified to encompass credit transactions, 9 So. 742, 744, 43 La. Ann. 886, 893, 1891 LEXIS 425, 4 (1891) (emphasis in original) (quoting <u>Pochelu v. Catonnet</u>, 4 So. 74, 76, 40 La. Ann. 327, 330 (1888)).  Because Recile formed this contract in the role of real estate developer, because Recile received adequate consideration for his payments, and, finally, because JSM was not a creditor to any of Recile's many corporations, this court declines to find this transaction outside of the scope of art. 2040.

**CONCLUSION**

For the foregoing reasons, this court reverses the district court's 1999 reversal of the bankruptcy court's 1985 judgment and orders the entry of judgment in favor of JSM.

Judgment **REVERSED.**