# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 11, 2015

Lyle W. Cayce
Clerk

No. 13-11305

RALPH S. JANVEY, In His Capacity as Court Appointed Receiver for the
Stanford International Bank Limited, et al; OFFICIAL STANFORD
INVESTORS COMMITTEE,

> Plaintiffs – Appellants,

v.

THE GOLF CHANNEL, INCORPORATED; Golf Channel, L.L.C., doing
business as Golf Channel,

> Defendants – Appellees.

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case requires us to interpret and apply the Texas Uniform
Fraudulent Transfer Act (TUFTA) to determine whether the court-appointed
receiver of a failed Ponzi scheme can recover nearly six million dollars that the
scheme spent advertising on a major cable network. Because Golf Channel
failed to proffer any evidence showing that its advertising services provided
reasonably equivalent value from the standpoint of Stanford's creditors, and
we have previously held that services furthering a debtor's Ponzi scheme

No. 13-11305

provide no value to the debtor's creditors, we REVERSE the district court's judgment and RENDER judgment in favor of the receiver.

## I.

The facts are undisputed. For nearly two decades, Stanford International Bank, Limited (Stanford) operated a multi-billion dollar Ponzi scheme[1] through more than 130 affiliated entities.[2] To sustain the scheme, Stanford promised investors exceptionally high rates of return on certificates of deposit (CD), and sold these investments through advisors employed at the affiliated entities. Some early investors received the promised returns, but, as was later discovered, these returns were merely other investors' principal. Before collapsing, Stanford had raised over $7 billion selling these fraudulent CDs.

Beginning in 2005, Stanford developed a plan to increase awareness of its brand among sports audiences. It targeted this group because of its large proportion of high-net-worth individuals, the people most likely to invest with Stanford. Stanford became a title sponsor of the Stanford St. Jude's Championship, an annual PGA Tour event held in Memphis, Tennessee. Upon hearing of Stanford's sponsorship, The Golf Channel, Inc., which broadcasted the tournament, offered Stanford an advertising package to augment its marketing efforts. In October 2006, Stanford entered into a two-year

---

[1] "'A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses.'" *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188 n.1 (5th Cir. 2013) (quoting *Eberhard v. Marcu*, 530 F.3d 122, 132 n. 7 (2d Cir. 2008).

[2] Stanford marketed itself as the "Stanford Financial Group" and sometimes entered into contracts through an affiliate, the Stanford Foundation. Given the large number of affiliated entities, for simplicity, we use "Stanford" throughout this opinion to refer to the whole enterprise.

No. 13-11305

agreement with Golf Channel for a range of marketing services including but not limited to: commercial airtime (682 commercials per year); live coverage of the Stanford St. Jude's Championship with interspersed messaging regarding Stanford's charitable contributions, products, and brand; display of the Stanford Logo throughout the event; promotion of Stanford as the sponsor of tournament-update segments that included video highlights every half-hour; and identification of Stanford as a sponsor of Golf Channel's coverage of the U.S. Open (one of the four major annual golf tournaments in the world). Golf Channel did not design Stanford's media strategy or develop the content of the advertisements. However, the agreement required Golf Channel's final approval. Stanford satisfied most of its monthly payment obligations to Golf Channel and, before the agreement expired, entered into a four-year renewal. By the time this lawsuit was initiated, Stanford had paid at least $5.9 million to Golf Channel pursuant to the agreement.

In February 2009, the SEC uncovered Stanford's Ponzi scheme and filed a lawsuit in the Northern District of Texas against Stanford and related entities requesting the district court to appoint a receiver over Stanford. The district court assumed exclusive jurisdiction, seized Stanford's assets, and appointed Ralph S. Janvey to serve as receiver. Pursuant to his powers, the receiver took custody of any and all assets owned by or traceable to the receivership estate, which included recovering any voidable transfers made by Stanford before going into receivership.

In the process of investigating Stanford's accounts, the receiver discovered the payments to Golf Channel, and in 2011, filed suit under TUFTA to recover the full $5.9 million. After initial discovery, the parties filed cross-motions for summary judgment. Despite the fact that Golf Channel offered no evidence to show how its services benefitted Stanford's creditors, the district

court granted Golf Channel's motion and denied the receiver's motion. The district court determined that although Stanford's payments to Golf Channel were fraudulent transfers under TUFTA, Golf Channel was entitled to judgment as a matter of law on its affirmative defense that it received the payments in good faith and in exchange for reasonably equivalent value (the market value of advertising on The Golf Channel). As the district court explained, "Golf Channel looks more like an innocent trade creditor than a salesman perpetrating and extending the Stanford Ponzi scheme."

## II.

We review a grant of summary judgment *de novo*, "applying the same standard on appeal that is applied by the district court." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (internal quotation marks omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Because both parties filed motions for summary judgment, we evaluate each party's motion independently and view the evidence in the light most favorable to the nonmoving party. *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## III.

Fraudulent transfer laws like TUFTA[3] were enacted to protect creditors against depletion of the debtor's estate. *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007). To that end, TUFTA allows creditors to void

---

[3] TUFTA, rather than another state's codification of the Uniform Fraudulent Transfer Act (UFTA), governs this dispute. *See* Tex. Bus. & Com. Code §§ 24.001–24.013. Before the district court, the parties argued whether Texas's or Florida's version of UFTA applied, but conceded before our court that it is a nonissue given that Texas and Florida have enacted nearly identical UFTA provisions. *See Stewart v. United States*, 512 F.2d 269, 272 n.10 (5th Cir. 1975) ("[N]o choice of law problem [is] present" where two states' laws "are essentially identical."). In such a scenario, the forum state's substantive law should apply. *See Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002).

fraudulent transfers made by a debtor and force the transferee to return the transfer to the debtor's estate. Tex. Bus. & Com. Code § 24.008. A transfer is fraudulent if made "with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 24.005(a)(1). "In this circuit, proving that [a debtor/transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014) (quoting *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011)); *accord Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)).

However, TUFTA provides an affirmative defense that transferees may use to prevent creditors from voiding transfers. Even where a transfer is fraudulent under TUFTA, a creditor cannot void the transfer if the transferee proves two elements: (1) that it took the transfer in good faith; and (2) that, in return for the transfer, it gave the debtor something of "reasonably equivalent value." Bus. & Com. § 24.009(a).

Given the undisputed fact that Stanford was engaged in a Ponzi scheme, the parties stipulated that the $5.9 million dollar transfer to Golf Channel was fraudulent. *See Brown,* 767 F.3d at 439. In addition, the district court held, and the receiver did not challenge on appeal, that Golf Channel took the transfer in good faith. Therefore, at issue here is whether Golf Channel has proven the second element of its affirmative defense—that its advertising services provided "reasonably equivalent value" as defined under TUFTA.

We analyze reasonably equivalent value under a two-step framework. First, we review *de novo* whether the property or service exchanged categorically had any value under TUFTA, as this is a question of law. *See, e.g.*, *Warfield*, 436 F.3d at 558 (holding that broker services furthering a Ponzi scheme have no value as a matter of law) *accord In re Fruehauf Trailer Corp.*,

5

No. 13-11305

444 F.3d 203, 212–13 (3d Cir. 2006) ("[A] court should *not* consider the 'totality of the circumstances' in evaluating the threshold question of whether any value was received at all.") (emphasis in original).    Because we hold that Golf Channel failed to prove that it exchanged something of value, we need not address the second step.[4]

    "Value" is defined in TUFTA as "property []transferred or an antecedent debt []secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."    Tex. Bus. & Com. Code § 24.004(a).    We must make an "Erie guess" as to how Texas would interpret this definition of "value" in TUFTA.    *See Warfield*, 436 F.3d at 558 (citing *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 406 (5th Cir. 2004)).    TUFTA itself instructs us to apply and construe its provisions so as "to effectuate [UFTA's] general purpose to make uniform the law with respect to the subject of [UFTA] among states enacting it."    Tex. Bus. & Com. Code § 24.012.    To that end, we may consider the comments to UFTA, authorities interpreting other states' UFTA provisions, and interpretations of section 548 of the Bankruptcy Code (upon which UFTA's definition of value is based).    *Nathan v. Whittington*, 408 S.W.3d 870, 873–74 (Tex. 2013); *First Nat. Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86 (Tex. 2003); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000); *see also Bowman v. El Paso CGP Co., L.L.C.*, 431 S.W.3d 781, 786 n.6 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) (explaining the persuasiveness of these sources).

    The relevant comment in UFTA states that the definition of "value" is:

---

[4] If there is some value, we review for clear error whether the value exchanged is reasonably equivalent to the value of the transfer. *Matter of Dunham*, 110 F.3d 286, 289 (5th Cir. 1997) (abrogating *Butler Aviation Int'l, Inc. v. Whyte (Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125 (5th Cir. 1993)).

No. 13-11305

[A]dapted from § 548(d)(2)(A) of the Bankruptcy Code. . . . The definition []is not exclusive [and] is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. *Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition.*

Unif. Fraudulent Transfer Act § 3 cmt. 2 (emphasis added). UFTA offers only one specific example of an exchanged benefit that fails the value test—love and affection. *See id.* (citing *United States v. West*, 299 F. Supp. 661, 666 (D. Del. 1969)). Therefore, courts are left to define the contours of "value" and "[t]he primary consideration . . . is the degree to which the transferor's net worth is preserved." *Warfield*, 436 F.3d at 558 (citing *Butler Aviation Int'l, Inc. v. Whyte (Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993)).[5] Importantly, we measure value "from the standpoint of the creditors," not from that of a buyer in the marketplace. *Stanley v. U.S. Bank Nat'l Assoc. (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)).

In *Warfield*, we held that commissions paid to a broker in exchange for securing new investments into a Ponzi scheme are voidable, even assuming the broker was unaware of the fraud. 436 F.3d at 560. Because the debtor's business was inherently illegitimate (a Ponzi scheme), the broker's services, which furthered the scheme, had no value as a matter of law.[6] *Id.* It made no

---

[5] In *Warfield*, we interpreted and applied Washington's UFTA provisions, which, in relevant part, are identical to the TUFTA provisions at issue in this case. *Compare* Tex. Bus. & Com. Code § 24.009(a), .004(a) *with* Wash. Rev. Code § 19.40.081(a), .031(a). Both states' provisions are codifications of sections 8 and 3 of the Uniform Fraudulent Transfer Act. They include identically worded affirmative defenses for transferees and identically worded definitions of "value."

[6] This conclusion is consistent with our circuit precedent and other circuits that have considered the meaning of "value" in UFTA and section 548 of the Bankruptcy Code in the context of a debtor engaged in a Ponzi scheme. *See Brown,* 767 F.3d at 441 (holding that because a contract promising returns on investment in a Ponzi scheme is void, payment of

7

difference whether those same broker services would have been valuable to legitimate businesses in the marketplace.

On summary judgment in the instant case, Golf Channel put forward no evidence that its services preserved the value of Stanford's estate or had any utility from the creditors' perspective.[7]   Golf Channel only brought forth evidence showing the *market* value of its services.  This was insufficient to satisfy its burden under TUFTA of proving value *to the creditors.  See* Unif. Fraudulent Transfer Act § 8 cmt. 1 ("The person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged.").

Moreover, Golf Channel's services did not, as a matter of law, provide any value to Stanford's creditors.  Just like the broker's (unknowing) efforts to extend the Ponzi scheme in *Warfield*, Golf Channel's (unknowing) efforts to extend Stanford's scheme had no value to the creditors.  While Golf Channel's services may have been quite valuable to the creditors of a legitimate business,

such returns does not reduce an antecedent contractual debt or compensate an investor for the time value of his money); *Donell v. Kowell*, 533 F.3d 762, 777–78 (9th Cir. 2008) (reasoning that interest payments to an investor in a Ponzi scheme "are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business" and do not compensate for the time value of money); *Scholes v. Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995) (holding that the time value of money that is invested in a Ponzi scheme has no value); *SEC v. Harris*, No. 3:09-CV-1809-B, 2010 WL 3719318, at * 2 (N.D. Tex. 2010) (holding that the goodwill received from promotional materials that a charity purchased in exchange for a donation from the Ponzi scheme had no value) *rev'd on other grounds*, *Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 528–29 (5th Cir. 2012); *Ramirez v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) (holding that the time value of money invested in a Ponzi scheme is not an exchange of value); *In re Indep. Clearing House Co.*, 77 B.R. 843, 859 (D. Utah 1987) (same).

[7] Such evidence might exist even in the context of a debtor engaged in a Ponzi scheme. Hypothetically, one can imagine an electricity provider putting on evidence that its services helped preserve the building in which the debtor operated, preventing the building's deterioration to the benefit of the debtors' creditors.  But here, Golf Channel has not put forth any evidence that its advertising services accrued any benefit to Stanford's creditors.

they have no value to the creditors of a Ponzi scheme.[8]  Ponzi schemes by definition create greater liabilities than assets with each subsequent transaction.  Each new investment in the Stanford Ponzi scheme *decreased* the value of the estate by creating a new liability that the insolvent business could never legitimately repay.  *See Brown*, 767 F.3d at 439 (describing the insolvency of Stanford's Ponzi scheme); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("[A] Ponzi scheme is, as a matter of law, insolvent from its inception." (internal quotation marks omitted)); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) ("The effect of such a scheme is to put the corporation farther and farther into debt . . . .").  Services rendered to encourage investment in such a scheme do not provide value to the creditors.

Golf Channel argues that its advertising services did not further the Stanford Ponzi scheme and that the $5.9 million reasonably represents the market value of those services.  It tries to distinguish its services from the broker services in *Warfield* on the ground that a broker directly secures new investment in to a Ponzi scheme, whereas an advertiser is an innocent "trade creditor" generally promoting a business's brand.  This distinction has no significance under TUFTA.  TUFTA makes no distinction between different types of services or different types of transferees, but requires us to look at the value of any services from the creditors' perspective.  We have no authority to create an exception for "trade creditors."  *See Truong v. Bank of Am., N.A.*, 717 F.3d 377, 387 (5th Cir. 2013) (refusing to recognize a statutory exception on

---

[8] Without any authority, Golf Channel argues that its own status as a creditor requires that we resolve this case in its favor.  From its perspective, the advertising services are of substantial value.  However, Golf Channel is not the only creditor we must consider.  It is one among many who have unsecured claims, and must wait its turn for a pro rata share of whatever remains in the Stanford estate.

the basis of policy concerns or the wisdom of the legislature in adopting a Louisiana statute).

We note that our conclusion here does not rest upon a conclusion that the advertising services themselves lacked value in the abstract. In granting Golf Channel's motion for summary judgment, the district court compared Golf Channel's services to consumables and speculative investments which have been held to have value under UFTA. The district court stated that "[i]t seems wrong . . . to hold that every transaction in which a debtor acquires consumables is a fraudulent transfer." We agree. As the district court explained, we have held that a debtor purchasing jet fuel to keep an affiliated airline in business is an exchange for reasonably equivalent value even though the value to the debtor is merely the potential proceeds of a possible sale of that affiliated airline.[9] *Matter of Fairchild*, 6 F.3d at 1123–27 (interpreting "value" in section 548 of the Bankruptcy Code). In fact, the investment in *Fairchild* was ultimately unsuccessful, yet, when measured at the time of the investment, we held that the increased possibility of selling the business had value. *Id.* at 1126–27. We explicitly rejected a definition of value that would exclude speculative or potential gains. *Id.* Here, however, the advertising

---

[9] Similarly, the Fourth Circuit held that ownership in a company whose only asset was a 1 in 22 chance of winning a cellular license in an FCC lottery had value. *See Cooper v. Ashley Commc'ns, Inc.* (*In re Morris Commc'ns NC, Inc.*), 914 F.2d 458, 466, 474–75 (4th Cir. 1990) (interpreting "value" in section 548 of the Bankruptcy Code). And the Third Circuit has held that a commitment letter that had only a small chance of maturing into financing had value. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 152–53 (3d Cir. 1996). In addition, the Sixth Circuit has held that the chance of winning on a bet in a casino had value. *In re Chomakos*, 69 F.3d 769, 770–71 (6th Cir. 1995). We agree with the district court and Golf Channel that consummables and speculative investments can have value. But the case before us is different because Stanford was engaged in a Ponzi scheme, not a legitimate enterprise. The issue is not whether Golf Channel's services have value in the abstract, but whether they provided reasonably equivalent value to Stanford's creditors.

No. 13-11305

services did not provide even a speculative economic benefit to Stanford's creditors.

## IV.

Accordingly, we REVERSE the district court's judgment and RENDER judgment in favor of the receiver.