# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 30, 2015

Lyle W. Cayce
Clerk

No. 13-11305

RALPH S. JANVEY, In His Capacity as Court Appointed Receiver for the Stanford International Bank Limited, et al.; OFFICIAL STANFORD INVESTORS COMMITTEE,

Plaintiffs – Appellants,

v.

THE GOLF CHANNEL, INCORPORATED; TGC, L.L.C., doing business as Golf Channel,

Defendants – Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM:

The original opinion in this case was filed on March 11, 2015.[1] In that opinion we reversed the district court's judgment and rendered judgment in favor of the receiver pursuant to the Texas Uniform Fraudulent Transfer Act (TUFTA), codified at Texas Business and Commerce Code §§ 24.001–.013. We held that, for purposes of the "good faith and for a reasonably equivalent value" affirmative defense in section 24.009(a), value must be measured from the

---

[1] *Janvey v. Golf Channel*, 780 F.3d 641 (5th Cir. 2015).

No. 13-11305

standpoint of a debtor's creditors and proof of market value is insufficient. Because The Golf Channel, Inc. (Golf Channel) failed to offer any evidence showing that its advertising services benefitted the creditors of Stanford International Bank Limited, we rendered judgment in favor of the receiver. Golf Channel filed a petition for panel rehearing and a petition for rehearing *en banc*, which are now pending before the court. In its petitions, Golf Channel requested, in the alternative, that we certify a question to the Supreme Court of Texas given "the lack of any Texas case law . . . interpreting TUFTA's definition of 'value' in the context of a good faith transferee of a Ponzi scheme."

The petition for panel rehearing is GRANTED, the original opinion is VACATED, and a majority of the panel substitutes the following opinion certifying a question to the Supreme Court of Texas.

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS, PURSUANT TO THE TEXAS CONSTITUTION ART. 5 § 3-C AND TEXAS RULE OF APPELLATE PROCEDURE 58.1.

## I.    STYLE OF THE CASE

The style of the case is Ralph S. Janvey, In His Capacity as Court Appointed Receiver for the Stanford International Bank Limited, et al.; Official Stanford Investors Committee, Plaintiffs – Appellants, v. The Golf Channel, Incorporated; TGC, L.L.C., doing business as Golf Channel, Defendants – Appellees, Case No. 13-11305, in the United States Court of Appeals for the Fifth Circuit, on appeal from the judgment of the United States District Court for the Northern District of Texas, Dallas Division. Federal jurisdiction over the issues presented in the case is based on 15 U.S.C. §§ 77v(a), 78aa, and 28

No. 13-11305

U.S.C. § 754, as the district court, the court that appointed Janvey as receiver, has jurisdiction over any claim brought by the receiver to execute his receivership duties.

## II.   STATEMENT OF THE CASE

The facts are undisputed.  For nearly two decades, Allen Stanford operated a multi-billion dollar Ponzi scheme[2] through more than 130 affiliated entities centered around Stanford International Bank Limited (Stanford).[3]  To sustain the scheme, Stanford promised investors exceptionally high rates of return on certificates of deposit (CD) and sold these investments through advisors employed at the affiliated entities.  Some early investors received the promised returns, but, as was later discovered, these returns were merely other investors' principal.  Before collapsing, Stanford had raised over $7 billion selling these fraudulent CDs.

Beginning in 2005, Stanford developed a plan to increase awareness of its brand among sports audiences.  It targeted this group because of the group's large proportion of high-net-worth individuals, the people most likely to invest with Stanford.  Stanford became a title sponsor of the Stanford St. Jude's Championship, an annual PGA Tour event held in Memphis, Tennessee.  Upon hearing of Stanford's sponsorship, The Golf Channel, Inc. (Golf Channel), which broadcasted the tournament, offered Stanford an advertising package to

---

[2] "'A "Ponzi scheme" typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses.'" *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188 n.1 (5th Cir. 2013) (quoting *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008)).

[3] Stanford marketed itself as the "Stanford Financial Group" and sometimes entered into contracts through an affiliate, the Stanford Foundation.  Given the large number of affiliated entities, for simplicity, we use "Stanford" throughout this opinion to refer to the whole enterprise.

No. 13-11305

augment its marketing efforts. In October 2006, Stanford entered into a two-year agreement with Golf Channel for a range of marketing services, including but not limited to: commercial airtime (682 commercials per year); live coverage of the Stanford St. Jude's Championship with interspersed messaging regarding Stanford's charitable contributions, products, and brand; display of the Stanford Logo throughout the event; promotion of Stanford as the sponsor of tournament-update segments that included video highlights every half-hour; and identification of Stanford as a sponsor of Golf Channel's coverage of the U.S. Open (one of the four major annual golf tournaments in the world). Golf Channel did not design Stanford's media strategy or develop the content of the advertisements. However, the agreement required Golf Channel's final approval. Stanford satisfied most of its monthly-payment obligations to Golf Channel and, before the agreement expired, entered into a four-year renewal. By the time this lawsuit was initiated, Stanford had paid at least $5.9 million to Golf Channel pursuant to the agreement.

In February 2009, the SEC uncovered Stanford's Ponzi scheme and filed a lawsuit in the Northern District of Texas against Stanford and related entities, requesting that the district court appoint a receiver over Stanford. The district court assumed exclusive jurisdiction, seized Stanford's assets, and appointed Ralph S. Janvey to serve as receiver. Pursuant to his powers, the receiver took custody of any and all assets owned by or traceable to the receivership estate, which included recovering any voidable transfers made by Stanford before going into receivership.

In the process of investigating Stanford's accounts, the receiver discovered the payments to Golf Channel, and in 2011, he filed suit under TUFTA to recover the full $5.9 million. After initial discovery, the parties filed cross-motions for summary judgment. Despite the fact that Golf Channel

4

offered no evidence to show how its services benefitted Stanford's creditors, the district court granted Golf Channel's motion and denied the receiver's motion. The district court determined that although Stanford's payments to Golf Channel were fraudulent transfers under TUFTA, Golf Channel was entitled to judgment as a matter of law on its affirmative defense that it received the payments in good faith and in exchange for reasonably equivalent value (the market value of advertising on The Golf Channel). As the district court explained, "Golf Channel looks more like an innocent trade creditor than a salesman perpetrating and extending the Stanford Ponzi scheme."

As discussed below, we initially reversed the district court's judgment and, relying on the text of TUFTA, the comments in the Uniform Fraudulent Transfer Act ("UFTA"), and our precedent, rendered judgment in favor of the receiver. Golf Channel, supported by several amici[4] who have similar claims pending against them, filed petitions for rehearing *en banc* and panel rehearing, arguing that market value is sufficient proof of "value" for purposes of TUFTA's affirmative defense, and alternatively arguing that we should certify the question to the Supreme Court of Texas.

## III.   LEGAL ISSUES

To decide whether the receiver is entitled to disgorge the $5.9 million payment for advertising services from Golf Channel, we must interpret Texas law, specifically the meanings of "value" and/or "reasonably equivalent value" in TUFTA. To decide questions of Texas law, we normally look first to the final decisions of the Supreme Court of Texas. *See Vanderbrook v. Unitrin Preferred Ins. Co. (In re Katrina Canal Breaches Litig.)*, 495 F.3d 191, 206 (5th Cir. 2007).

---

[4] IMG Worldwide, Inc., International Players Championship, Inc., ATP Tour, Inc., and PGA Tour, Inc. filed a joint amicus brief, and the University of Miami filed a separate amicus brief.

No. 13-11305

However, in the absence of a definite pronouncement from the Supreme Court of Texas on an issue, we may certify a question to the Supreme Court of Texas. Under Texas law, "[t]he Supreme Court of Texas may answer questions of law certified to it by any federal appellate court if the certifying court is presented with determinative questions of Texas law having no controlling Supreme Court precedent." Tex. R. App. P. 58.1; *see also* Tex. Const. art. V, § 3-c(a) (conferring jurisdiction on the Supreme Court of Texas and the Texas Court of Criminal Appeals to answer questions of state law certified to them by a federal appellate court). "[C]ertification may be advisable where important state interests are at stake and the state courts have not provided clear guidance on how to proceed." *La. State v. Anpac La. Ins. Co. (In re Katrina Canal Breaches Litig.)*, 613 F.3d 504, 509 (5th Cir. 2010) (internal quotation marks omitted).

Because there is no decision by the Supreme Court of Texas that resolves the determinative issue in this case—whether market value is sufficient proof of reasonably equivalent value for purposes of the affirmative defense in section 24.009(a) of TUFTA—we certify the question to the Supreme Court of Texas.

**A.**

Fraudulent transfer laws like TUFTA were enacted to protect creditors against depletion of the debtor's estate. *Corpus v. Arriaga*, 294 S.W.3d 629, 634 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *see also Englert v. Englert*, 881 S.W.2d 517, 518 (Tex. App.—Amarillo 1994, no writ) ("[The] right to prefer does not extend to transfers made in fraud of the rights of the other creditors."). To that end, TUFTA allows creditors to void fraudulent transfers made by a debtor and force the transferee to return the transfer to the debtor's estate. Tex. Bus. & Com. Code § 24.008. A transfer is fraudulent if made "with actual intent to

hinder, delay, or defraud any creditor of the debtor." Bus. & Com. § 24.005(a)(1). "In this circuit, proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014) (alteration in original) (quoting *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011)); *accord Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)).

However, TUFTA provides an affirmative defense that transferees may assert to prevent creditors from voiding transfers. Even where a transfer is fraudulent under TUFTA, a creditor cannot void the transfer if the transferee proves two elements: (1) that it took the transfer in good faith; and (2) that, in return for the transfer, it gave the debtor something of "reasonably equivalent value." Bus. & Com. § 24.009(a).

We analyze reasonably equivalent value under a two-step framework. First, we review *de novo* whether the property or service exchanged categorically had any value under TUFTA, as this is a question of law. *See, e.g.*, *Warfield*, 436 F.3d at 559–60 (holding that broker services furthering a Ponzi scheme have no value as a matter of law); *accord Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006) ("[A] court should *not* consider the 'totality of the circumstances' in evaluating the threshold question of whether any value was received at all."). If there is some value, we review for clear error whether the value exchanged is reasonably equivalent to the value of the transfer. *Tex. Truck Ins. Agency, Inc. v. Cure (In re Dunham)*, 110 F.3d 286, 289 (5th Cir. 1997) (abrogating *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125 (5th Cir. 1993)).

7

No. 13-11305

Given the undisputed fact that Stanford was engaged in a Ponzi scheme, the parties stipulated that the $5.9 million dollar transfer to Golf Channel was fraudulent. *See Brown,* 767 F.3d at 439. In addition, the district court held, and the receiver did not challenge on appeal, that Golf Channel accepted the transfer in good faith, that is, it had no knowledge of the Ponzi scheme, and provided the advertising services for market value. Therefore, the sole issue here is whether Golf Channel has proven the second element of its affirmative defense—that its advertising services constituted "value" and/or "reasonably equivalent value," terms of art under TUFTA.

**B.**

There are two statutory provisions and one comment that frame the certified question:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Bus. & Com. § 24.004(a). The relevant comment in UFTA, which is not expressly codified in TUFTA, states:

> [The definition of "value"] is adapted from § 548(d)(2)(A) of the Bankruptcy Code. . . . The definition [ ]is not exclusive [and] is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. *Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition.* The definition does not specify all the kinds of consideration that do not constitute value for the purposes of this Act—e.g., love and affection . . . .

Unif. Fraudulent Transfer Act § 3 cmt. 2 (emphasis added). Texas courts have noted that we may consider the comments to UFTA, authorities interpreting other states' UFTA provisions, and interpretations of section 548 of the

8

No. 13-11305

Bankruptcy Code (upon which UFTA's definition of value is based). *Nathan v. Whittington*, 408 S.W.3d 870, 873–74 (Tex. 2013); *First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86 (Tex. 2003); *Hinsley v. Boudloche (In re Hinsley)*, 201 F.3d 638, 643 (5th Cir. 2000); *see also Bowman v. El Paso CGP Co., L.L.C.*, 431 S.W.3d 781, 786 n.6 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) (explaining the persuasiveness of these sources). Pursuant to UFTA, we have measured value "from the standpoint of creditors," not from that of a buyer in the marketplace. *See, e.g.*, *Stanley v. U.S. Bank Nat'l Assoc. (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)); *Warfield*, 436 F.3d at 560 ("The primary consideration . . . is the degree to which the transferor's net worth is preserved.").

In possible tension with this comment on "value" is TUFTA's statutory definition of "reasonably equivalent value." *See* Bus. & Com. § 24.004(d). TUFTA defines "reasonably equivalent value" as follows:

> "Reasonably equivalent value" includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction.

Bus. & Com. § 24.004(d). This definition suggests that value should be measured from the perspective of a buyer in the general marketplace, not from the perspective of creditors.[5] The affirmative defense in section 24.009(a) specifically uses the statutorily-defined term "reasonably equivalent value." However, use of "transferor" and "assets" in section 24.004(d) gives us pause because "transferor" is consistently used throughout TUFTA to refer to the

---

[5] As an economic reality, something exchanged that has market value will often be of value to a debtor's creditors because the item can be resold in the general marketplace or it in some way preserves the value of the debtor's assets. But, value in the market and value to the creditors may not be the same in the context of a debtor engaged in a Ponzi scheme.

debtor, and "assets" is a defined term referring to the debtor's property. *See* Bus. & Com. § 24.002(2). Here, it is not the debtor, Stanford, who transferred assets for cash payment, but Golf Channel who transferred services for cash payment.

Herein lies the tension presented in this case—how to reconcile specifically the comment and the statutory definition of "reasonably equivalent value." Put another way, under TUFTA, is proof of the market value sufficient to establish "reasonably equivalent value" for purposes of the affirmative defense in § 24.009(a), or must the transferee produce specific evidence to show value of the transfer to the debtor's creditors? Moreover, such questions may lead to the additional issue of how value might be determined when value is viewed from the "creditor's viewpoint." The Supreme Court of Texas has not answered these questions and Texas cases applying TUFTA provide little guidance in this area. These are important questions that are determinative in this case.

## C.

On summary judgment, Golf Channel put forward no evidence that its advertising services preserved the value of Stanford's estate or constituted value from the creditors' point of view.[6] Instead, Golf Channel brought forth evidence showing the *market* value of its services and conceded at oral argument that it had no evidence specifically showing value to Stanford's

---

[6] As our prior opinion noted, such evidence might exist even in the context of a debtor engaged in a Ponzi scheme. Hypothetically, one can imagine an electricity provider putting on evidence that its services helped preserve the building in which the debtor operated, preventing the building's deterioration to the benefit of the debtors' creditors. But here, Golf Channel has not put forth any evidence that its advertising services accrued any benefit to Stanford's creditors. This view of value, however, may render valueless many goods and services, which were provided in good faith, that are unrelated to real property or consumables.

creditors.[7]   Thus, if value is to be measured from the standpoint of the creditors, Golf Channel has not satisfied its burden of proof.  *See* Unif. Fraudulent Transfer Act § 8 cmt. 1 ("The person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged.")

In granting Golf Channel's motion for summary judgment, the district court compared Golf Channel's services to consumables and speculative investments, which have been held to have value under UFTA and section 548 of the Bankruptcy Code.  The district court stated that "[i]t seems wrong . . . to hold that every transaction in which a debtor acquires consumables is a fraudulent transfer."   As the district court explained, we have held that a debtor's purchasing jet fuel to keep an affiliated airline in business is an exchange for reasonably equivalent value even though the value to the debtor is merely the potential proceeds of a possible sale of that affiliated airline.  *In re Fairchild*, 6 F.3d at 1123–27 (interpreting "value" in section 548 of the Bankruptcy Code).   In fact, the investment in *Fairchild* was ultimately unsuccessful, yet, when measured at the time of the investment, we held that the increased possibility of selling the business had value.  *Id.* at 1126–27.  We explicitly rejected a definition of value that would exclude speculative or potential gains.  *Id.*  The transferee offered sufficient proof to show that the

---

[7] Golf Channel argued for the first time in its petition for rehearing that Stanford's payments were in exchange for reasonably equivalent value because they satisfied antecedent debt obligations owed pursuant to the advertising contract.  It did not argue this point before the district court, in its response brief in our court, or raise it at oral argument.  Therefore, under our rules regarding forfeiture, this argument is forfeited.  *United States v. Scroggins*, 599 F.3d 433, 446–449 (5th Cir. 2010); *Haubold v. Intermedics, Inc.*, 11 F.3d 1333, 1336 (5th Cir. 1994); *Zuccarello v. Exxon Corp.*, 756 F.2d 402, 407 (5th Cir. 1985).  Nevertheless, we do not presume to restrict the Supreme Court of Texas from discussing on certification the meaning and applicability of the antecedent debt clause in TUFTA's definition of "value."

speculative investment at least had the potential to benefit the debtor's creditors.

But the case before us may be different because Stanford was engaged in a Ponzi scheme, not a legitimate enterprise. Given that Ponzi schemes, by definition, create greater liabilities than assets with each subsequent transaction, each new investment in the Stanford Ponzi scheme *decreased* the value of the estate by creating a new liability that the insolvent business could never legitimately repay. *See Brown*, 767 F.3d at 439 (describing the insolvency of Stanford's Ponzi scheme); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("[A] Ponzi scheme is, as a matter of law, insolvent from its inception." (internal quotation marks omitted)); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) ("The effect of such a scheme is to put the corporation farther and farther into debt . . . ."). Because each new transaction created greater liabilities, Golf Channel has so far been unable to offer evidence to show that its services provided value (even potential value) to Stanford's creditors.[8] Thus, this case turns on whether TUFTA measures "reasonably equivalent value" from the perspective of creditors, or rather from the perspective of the general marketplace—an open state-law question on which we now seek guidance.

Golf Channel has argued that determining "reasonably equivalent value" from the perspective of a debtor's creditors potentially could have dire effects on innocent trade creditors who have dealt with businesses engaged in fraudulent conduct. Such innocent providers of legitimate services having

---

[8] Of course, to the extent Golf Channel's services generated new investors in the scheme, the cash from those investments could have been used to pay existing debts owed to *some* earlier investors and service providers. However, viewing Stanford's financial situation on the whole, Stanford remained insolvent regardless of such new investments.

value in the marketplace might unknowingly transact with a business engaged in a Ponzi scheme only to later discover that its revenues from the transaction have to be disgorged under TUFTA. It is clear that TUFTA was designed to strike a balance between protecting the creditors of an insolvent business while at the same time ensuring that third-party merchants and transferees (who, ironically, may also be creditors post-bankruptcy) would have an affirmative defense to protect their earnings. Precisely where TUFTA draws the line between the various interested parties is the difficult question that Texas courts have yet to answer.

**D.**

Given the possible tension within TUFTA with respect to the perspective from which to measure "reasonably equivalent value," that this is a question of state law that no on-point precedent from the Supreme Court of Texas has resolved, that the Supreme Court of Texas is the final arbiter of Texas's law, and that the meaning of "reasonably equivalent value" is central to this case as well as other pending cases filed by Stanford's receiver, we believe it is best to certify the question at issue.

**IV.   QUESTION CERTIFIED**

For the reasons above, we CERTIFY the following question to the Supreme Court of Texas:

> Considering the definition of "value" in section 24.004(a) of the Texas Business and Commerce Code, the definition of "reasonably equivalent value" in section 24.004(d) of the Texas Business and Commerce Code, and the comment in the Uniform Fraudulent Transfer Act stating that "value" is measured "from a creditor's viewpoint," what showing of "value" under TUFTA is sufficient for a transferee to prove the elements of the affirmative defense under section 24.009(a) of the Texas Business and Commerce Code?

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the question certified.

13